**UNITED STATE of America, Plaintiff,**

**v.**

**Richard Lee Tuck CHONG, Defendant.**

**No. CR 98–00416 ACK.**

United States District Court, D. Hawai'i.

May 25, 2001.

Michael A. Weight, Office of Fed. Public Defender, Honolulu, HI, Marcia A. Morrissey, Santa Monica, CA, for Defendant.

Larry L. Butrick, Office of the U.S. Atty., Honolulu, HI, for U.S.

### ORDER DENYING DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA

KAY, District Judge.

### BACKGROUND

On July 9, 1998, Richard Lee Tuck Chong ("Chong") was indicted on drug conspiracy and murder related charges surrounding the September 24, 1997, shooting death of William Noa. The Government filed a superseding indictment on December 16, 1999, charging Chong with two capital counts. On February 12, 1999 the government filed a Notice of Intent to Seek a Sentence of Death. Trial was scheduled to begin January 19, 2000.

On January 12, 2000, Chong signed a plea agreement providing for a sentence of life imprisonment without parole, pursuant to Federal Rule of Criminal Procedure 11(e)(1)(C). After conducting a Rule 11 hearing[1] on January 13, 2000, this Court

---

**1.** The prerequisites to accepting a guilty plea are set out in subdivisions (c) and (d) of Rule 11. Subdivision (c) provides: "Before accepting a plea of guilty ..., the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands" the numerous consequences of pleading guilty.

accepted Chong's plea of guilty, deferring acceptance of the plea agreement pending preparation of a pre-sentence investigation report. Chong was scheduled to be sentenced on July 24, 2000.

On July 10, 2000, this Court received a letter written by Chong, dated July 7, 2000, asking the Court to allow Chong to withdraw his plea of guilty (hereinafter "Chong Letter"). The Court construed this letter as a motion to withdraw such plea pursuant to Federal Rule of Criminal Procedure 32(e). The Government filed an Opposition on July 18, 2000. On July 21, 2000 a hearing on Chong's Motion was held and at that time Chong requested appointment of new counsel for the purpose of arguing the withdrawal motion. On July 24, 2000, Magistrate Judge Kurren appointed attorneys Richard Burr and Birney Brevar for the limited purpose of representing Chong in his Motion to Withdraw Guilty Plea.

On November 13, 2000 Chong filed a Motion to Withdraw Guilty Plea. On February 1, 2001 the parties stipulated to a waiver of attorney-client privilege. On March 9, 2001 the Government filed a supplemental response to Chong's Motion to Withdraw Guilty Plea. On March 21, 2001 Chong filed a Reply. The night before the scheduled hearing on the Motion, March 27, 2001, Chong was taken to the emergency room for a racing heart episode. At that time he was prescribed Digoxin to control future episodes. The Court continued the hearing to allow Chong to be examined concerning potential side-effects of the medication. Upon receiving declarations from Chong's cardiologist and primary physician and determining that Chong was prepared to go forward, and with Chong requesting the Court to proceed, a hearing on the Motion was held May 3, 2001 at 10:00 a.m.

## DISCUSSION

■ Rule 32(e) of the Federal Rules of Criminal Procedure provides that a district court may allow a defendant to withdraw his guilty plea before he is sentenced "if the defendant shows any fair and just reason." The requirement applies after a plea of guilty has been accepted by the district court, regardless of whether or not a plea agreement has been accepted by the court. *See United States v. Hyde*, 520 U.S. 670, 671, 117 S.Ct. 1630, 137 L.Ed.2d 935 (1997) (overturning a Ninth Circuit decision which held a defendant need not show a fair and just reason to withdraw a guilty plea after a guilty plea had been accepted but before the court rendered a decision on acceptance of the plea agreement).

■ Withdrawal is freely given, but the burden is on the defendant to show a fair and just reason. *United States v. Read*, 778 F.2d 1437, 1440 (9th Cir.1985). The defendant has no right to withdraw a plea. *Id.* Whether to allow such a withdrawal "is committed to the sound discretion of the trial court." *United States v. Navarro–Flores*, 628 F.2d 1178, 1183 (9th Cir.1980).

■ A "fair and just reason" involves a plea that is "unfairly obtained or given through ignorance, fear or inadvertence." *Kercheval v. United States*, 274 U.S. 220, 224, 47 S.Ct. 582, 71 L.Ed. 1009 (1927) (cited in *United States v. Rubalcaba*, 811 F.2d 491, 492 (9th Cir.1987)). A claim of innocence, supported by evidence not available at the time of the entry of the plea, might be a fair and just reason for allowing withdrawal of a guilty plea. *See United States v. Nagra*, 147 F.3d 875, 880 (9th Cir.1998) (noting that when defendant asserts innocence based on evidence with-

---

Subdivision (d) provides: "The court shall not accept a plea of guilty ... without first, by addressing the defendant personally in open court, determining that the plea is voluntary."

held by government and only discovered upon resentencing, "manifest injustice" might result if plea were not withdrawn); *United States v. Turner,* 898 F.2d 705, 713 (9th Cir.1990).

A defendant's mere change of heart about pleading guilty, or unsupported claims of innocence, are insufficient to allow him to withdraw his plea. *See United States v. Rios–Ortiz,* 830 F.2d 1067, 1069–70 (9th Cir.1987); *Turner,* 898 F.2d at 713. Statements made during the plea hearing are entitled to a strong presumption of veracity in later attacks on the plea. *See United States v. Anderson,* 993 F.2d 1435, 1438 (9th Cir.1993); *United States v. Mims,* 928 F.2d 310, 313 (9th Cir.1991); *United States v. Hoyos,* 892 F.2d 1387, 1400 (9th Cir.1989) (holding that district court was entitled to credit defendant's testimony at time he entered plea and to disbelieve the allegations in affidavit in support of motion to withdraw guilty plea). A court may also consider the time elapsed between the entering of such plea and his withdrawal request. *See United States v. Alber,* 56 F.3d 1106, 1111 (9th Cir.1995) (noting fact that defendant waited until three months after guilty plea to make withdrawal motion undermined his position that there had been a misunderstanding during his plea hearing); *United States v. Navarro–Flores,* 628 F.2d 1178, 1184 (9th Cir.1980) (rejecting motion to withdraw guilty plea made over a month after plea entered and after co-defendant sentenced).

Chong has failed to present a fair and just reason to withdraw the plea. Chong presents three reasons why the court should grant the motion. First, he argues that he was innocent of the murder of William Noa as charged in the superceding indictment. Secondly, he argues the Rule 11 hearing was inadequate because the Court did not "clarify" several of Chong's responses which Chong now characterizes as non-responsive or inap-

propriate. Lastly, Chong argues that his prescription medication Wellbutrin made his guilty plea unintelligent and involuntary.

The Court finds that Chong's conduct has been consistent with his plea of guilty and Chong has presented no facts which suggest the existence of exonerating evidence not available to him at the time of the plea. In light of the Rule 11 hearing transcript read as a whole and the Court's lifelong knowledge, experience and understanding of the local pigeon dialect, its colloquy with Chong during the change of plea hearing was sufficient to determine that Chong had made an intelligent, knowing and voluntary plea. Additionally, the Court finds that the prescription drug Wellbutrin did not interfere with Chong's ability to make a careful, rational and reasoned decision to plea guilty. Accordingly, Chong has presented no evidence of a just and fair reason for this Court to grant his motion and the Motion to Withdraw Guilty Plea is DENIED.

## I. *CLAIM OF INNOCENCE*

A claim of innocence, supported by evidence not available at the time of the entry of the plea, might be a fair and just reason for allowing withdrawal of a guilty plea. *See United States v. Nagra,* 147 F.3d 875, 880 (9th Cir.1998). However, a mere change of heart or unsupported claims of innocence, are insufficient to allow him to withdraw his plea. *See United States v. Rios–Ortiz,* 830 F.2d 1067, 1069–70 (9th Cir.1987). Chong neither points to newly discovered evidence nor provides any other form of support for his claim of innocence. Moreover, Chong swore at his plea hearing that he was in fact guilty of the crime to which he pleaded guilty. *See* Tr. at 25, 29–33. These solemn declarations of guilt are presumed truthful. *See Rubalcaba,* 811 F.2d at 494. Chong's conduct has

also been consistent with his plea of guilty, in that he has authored letters to the victim's mother and girlfriend, apologizing for killing William Noa. *See* Ex. B to Government's Response dated July 18, 2000, Letter from Chong to Raynette Olivia of December 21, 1999 ("I have decided to plead guilty to life in prison without possibility of parole that puts me away forever!") (hereinafter "Raynette Letter"); Ex. C to Government's Response dated July 18, 2000, Letter from Chong to Mrs. Noa ("I write to you to miki miki (apologize) and seek your forgiveness for this unfortunate incident which took from you your son and there [sic] brother.") (hereinafter "Mrs. Noa Letter"). These letters quite naturally do not, however, explicitly admit that Chong committed murder "with premeditation".

Chong's contention that he is innocent of the crime to which he pled guilty, without the support of any new information or evidence of his innocence is not by itself a fair and just reason to allow withdrawal of the guilty plea.

## II. *ADEQUACY OF THE RULE 11 HEARING*

Chong's next claim is that the Rule 11 hearing was inadequate because the Court did not sufficiently determine that Chong's plea was knowing, intelligent, and voluntary. Chong argues that although he admitted that he was guilty of premeditated murder on many occasions during the plea hearing, when asked directly and explicitly whether he committed premeditated murder, his responses either expressed initial confusion or were non-responsive. Chong argues that his "correct" answers were simple rote responses without underlying understanding and the "incorrect" responses are a better representation of his inability to understand the proceedings.

Chong argues his responses on these occasions during the plea hearing required clarification or follow-up questioning by the Court in order to determine if his plea was knowing and intelligent. A section of the colloquy reads:

THE COURT: I said, again, I'll ask you: You do agree to the facts that you admitted in Paragraph 8 [admitting to the premeditated killing of Noa] of the plea agreement?

DEFENDANT RICHARD LEE TUCK CHONG: Yes, Yes, I do.

THE COURT: And you knew what you were doing at the time that you shot Mr. Noa?

DEFENDANT RICHARD LEE TUCK CHONG: Yes, I do.

THE COURT: You weren't totally incapacitated by being under the influence of alcohol or drugs?

DEFENDANT RICHARD LEE TUCK CHONG: No, I wasn't.

THE COURT: And you shot him with premeditated intent to kill him?

DEFENDANT RICHARD LEE TUCK CHONG: Yes, I do.[2]

Tr. 32–33. Chong's argument that the Plea hearing was inadequate hinges primarily on these two responses of "I do" instead of "I did". He argues that his responses of "I do" were inappropriate in the context and therefore evidenced a misunderstanding of the question asked.

Reading the three questions together the Court first notes that the question asked and answered between the two "I do" responses required something more than a "rote" response. Chong obviously followed and answered that question easi-

---

**2.** Another example of Chong's usage of "I do" is when he was asked "Are you willing to be interviewed by the probation officer for the preparation of that presentence report, and my reviewing that report prior to determining whether or not to accept the plea agreement?" Mr. Chong responded with "Oh, yes, I do." Tr. at 18:12–16.

ly, evidencing that he was not simply parroting answers but paying close attention to each question and the proceedings as a whole. Furthermore, the response of "I wasn't" to the question "were you totally incapacitated" reaffirms Chong's earlier response that he knew what he was doing at the time he shot Mr. Noa.

When these responses are considered in light of Chong's style of speaking, the Court's familiarity of the local dialect, and the multiple other times Chong admitted his guilt, it is abundantly clear that Chong knew exactly what he was pleading guilty to and was doing so intelligently and voluntarily. Chong's manner of speaking is a pigeon dialect common to the local community and very familiar to this Court. The Court needed no further clarification of Chong's responses, because just as they expressed Chong's understanding of the questions, his answers clearly expressed to this Court Chong's agreement with and understanding of the Court's questions. Translating "I do" into "I did" was natural and normal for the Court in consideration of Chong's known manner of speech given the typical local pigeon dialect's loose use of verbs.[3]

In response to the Court's asking Chong whether he was guilty of the crime charged and reading of Count 3 of the indictment, ending the question with "that you with malice aforethought did unlawful-

ly kill William Noa by shooting him with the above described firearm willfully, deliberately and maliciously with premeditation", Chong responded, "Huh? Yeah, yeah." Tr. at 29–30. In order to explain this clear admission to premeditated murder, Chong characterizes the Court's question as a "convoluted query" and dismisses the response as expressing "initial confusion". The Court finds, to the contrary, that Chong's response was a clear and definite admission of the crime charged.

Moreover, on five other occasions during the plea hearing Chong either admitted his guilt or affirmatively expressed his desire to plead guilty to the first degree murder charge (premeditated killing). Twice the Court asked Chong if he wanted to enter a plea of guilty and twice Chong answered with a clear "yes." *See* Tr. at 9, 13. The Court then read Count 3 of the Superceding Indictment and the joint jury instructions explaining exactly what the Government would have to prove in order for a jury to find Chong guilty of premeditated murder. *See* Tr. at 14–16. Chong stated that he understood the charge. *See* Tr. at 17. The Court then established that Chong had read and understood the plea agreement. *See* Tr. at 21–22. The Court asked Chong if he admitted to the facts set forth in Paragraph 8 of the plea agreement and upon conferring with counsel, Chong responded "Yes, Your Honor".[4] *See* Tr. at

3. The following are some examples of Chong's local pigeon:
 THE COURT: And do you understand if I reject the plea agreement you will have the right to withdraw your plea of guilty?
 DEFENDANT RICHARD LEE TUCK CHONG: What you said?
 THE COURT: If I reject your plea agreement, then you will have the right to withdraw your plea of guilty. Do you understand that?
 DEFENDANT RICHARD LEE. TUCK CHONG: Oh, yeah, okay. Tr. at 18.
 THE COURT: You understand each and every provision of the plea agreement?

DEFENDANT RICHARD LEE TUCK CHONG: Yes, I have.
THE COURT: Do you have any questions regarding the plea agreement?
DEFENDANT RICHARD LEE TUCK CHONG: No. No more. Tr. at 22.

4. Paragraph 8 states in part "Defendant produced a .38 caliber pistol hidden on his person and shot William Noa in the head with the premeditated intent to kill Noa for his failure to repay Defendant the $100 owed to him for the fronted crystal methamphetamine."

25–26. The Court then asked the Assistant U.S. Attorney to summarize the evidence that the Government would have presented if the matter had gone to trial. *See* Tr. at 30. After the AUSA's proffer of the facts, the Court asked Chong if he agreed with the prosecutor's summary of what Chong did and of what occurred. *See* Tr. at 32. At this point Defense counsel stipulated that Chong would agree to the facts as laid out in Paragraph 8 of the plea agreement. *Id.* Accordingly, the Court asked Chong if he agreed with the facts as set forth in Paragraph 8. *Id.* The Court repeated the question for Chong and Chong responded, "Yes. Yes, I do." *Id.* At the end of the plea hearing, after having heard the superceding indictment read by the Court, the proffer of facts given by the AUSA and having been asked twice by the Court whether Chong admitted to the facts set forth in Paragraph 8 of the plea agreement, the Court confirmed that Chong wished to plead guilty asking, "Mr. Chong, how do you plead as to Count 3 of the superceding indictment?" Chong replied, "I plead guilty, Your honor." *See* Tr. at 33–34. Moreover, Chong's defense counsel represented to the Court that the plea was free, knowing, and voluntary. *See* Tr. at 34.

Considering the transcript of the plea hearing as a whole, it is eminently clear that Chong understood the crime to which he plead guilty. *See United States v. Kamer*, 781 F.2d 1380, 1385 (9th Cir.1986) citing *United States v. Coronado*, 554 F.2d 166 (5th Cir.1977)(must consider transcript as a whole); *United States v. Byrd*, 804 F.2d 1204, 1206 (11th Cir.1986) ("[O]ur duty is to view the record as a whole, and we must affirm if the record of the hearing shows a common sense basis for agreeing that the trial judge fully satisfied himself that 'the defendant understands what he is admitting and what the consequences of that admission may be, as well as that what he is admitting constitutes the crime charged, and that his admission is voluntarily made.'") citing *United States v. Dayton*, 604 F.2d 931, 943 (5th Cir.1979) (en banc) *cert. denied* 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980). This Court conducted a lengthy and thorough Rule 11 hearing and upon listening to Chong's answers and observing Chong's demeanor and conduct throughout the hearing, concluded that Chong's plea was knowing and voluntary. *See* Tr. at 29 ("The Court finds that the plea is an intelligent, knowing and voluntary one and not the result of any force or threat or inducement other than a valid plea agreement."). The Court also made the following finding:

> The Court ... finds that Mr. Chong has sufficient mental competency to make a knowing and voluntary waiver of his constitutional rights and enter into a plea agreement, and to make a reasoned choice among the alternatives presented to him and to understand the alternatives presented to him, and to understand the nature and consequence of the plea of guilty and to understand the nature and consequences of the proceedings against him and to assist properly in his defense.

Tr. at 33. The Court stands by its original assessment of Chong's understanding of what he was pleading to and finds that the Rule 11 hearing was adequate to determine that Chong's plea was knowing, intelligent and voluntary.

## III THE PRESCRIPTION DRUG WELLBUTRIN DID NOT RENDER CHONG UNABLE TO ENTER A KNOWING AND VOLUNTARY PLEA

Chong argues that his entry of the guilty plea was involuntary because he was taking the prescription medication Wellbutrin. Chong argues that Wellbutrin made him apathetic, or calmer, less emotional, lacking personal autonomy, and

more rational, and he was therefore more easily convinced by his defense team to plead guilty. Chong's argument is basically that while he was more able to rationally consider the plea alternatives, he was less emotionally involved so that he cared less about the consequences of his plea. The Court finds this argument to be internally inconsistent, without merit, and contrary to Chong's testimony, the testimony of his original defense attorneys and his letter to the Court. An argument that Chong's plea was not knowing, intelligent and voluntary because the drug he was taking made him more rational and better focused appears nonsensical.

At the Rule 11 hearing Chong informed the Court that he was taking Wellbutrin, the trade name for the chemical agent buproprion. In response to the Court's further inquiry into whether Wellbutrin "impair[ed][his] ability to think clearly", Chong stated that "It doesn't impair me. It help me, yeah." Tr. at 10. Indeed, Chong's demeanor and conduct at the Rule 11 hearing supports such a conclusion, as he requested clarification when necessary (for example, asking "I beg your pardon, sir?" of the Court (Tr. at 32)), indicated a clear understanding of the proceedings, and was-well oriented, focused, alert, concerned and attentive. Chong listened intently, and indicated that he understood the charge to which he was pleading, and further proclaimed that he was "seriously satisfied" with the representation of his attorneys. Tr. at 13, 17.

In addition to the Court's observations of Chong's demeanor at the Rule 11 hearing, the observations by his defense counsel support the finding that Chong was fully cognizant of the importance of the proceeding and concerned about the effect of his decision while entering the plea. Defense attorney Weight states that at the plea hearing "[Chong] experienced visible stress and continued to express his ambivalence though he said he was willing to go forward with the plea." *See* Ex. 1 to Defendant's Reply filed March 21, 2001, Declaration of Michael A. Weight at ¶ 7 (hereinafter "Weight Dec."). Defense counsel Donna Gray stated that she observed that Mr. Chong was stressed, but stated that he would "go through with it." Ex. 2 to Defendant's Reply filed March 21, 2001, Declaration of Donna M. Gray at ¶ 7 (hereinafter "Gray Dec."). Additionally, Weight testified at the hearing on this Motion that Chong asked for a copy of the plea agreement so that he could read it at night, that Chong stated he read the agreement and that Chong understood the agreement. *See* Withdraw Plea Tr. at 87–88. Defense attorney Marcia Morrissey states that the defense team reviewed the plea agreement with Chong over the course of three days, that Chong read the agreement, "was aware of the facts the government would be required to prove" and "was rational and appropriately discussed the plea agreement and plea process" and expressed "increased anxiety" over the decision. Ex. 5 to Government's Supplemental Response filed March 9, 2001, Declaration of Marcia Morrissey at ¶ 9 (hereinafter "Morrissey Dec."). These statements belie both the proposition that the Wellbutrin made Chong unconcerned and overly calm about pleading guilty and that Chong did not understand what he was pleading guilty to.

Chong's motion is supported with an affidavit of Dr. Roderick W. Pettis. Dr. Pettis states that the most common side effects of Wellbutrin are "insomnia, central nervous system stimulation (usually experienced as irritability or restlessness), headache, dry mouth, nausea and tremor." Ex. 4 to Chong's Motion filed November 13, 2000, Affidavit of Roderick W. Pettis, M.D. at 5 (hereinafter "Pettis Affidavit"). Dr. Pettis states that patients taking antidepressants occasionally, but not common-

ly, report concerns about apathy. *See* Pettis Affidavit at 6. Upon interviewing Chong and the members of Chong's defense team, Dr. Pettis stated that Wellbutrin gave Chong a calmer disposition and improved his ability to concentrate and focus. *See* Ex. 3 to Chong's Motion filed November 13, 2000, Supplemental Affidavit of Roderick W. Pettis, M.D. at 2 (hereinafter "Supplemental Pettis Affidavit"). Dr. Pettis concludes that he is "unable to render an opinion, with the requisite degree of medical certainty, whether or not Wellbutrin rendered Mr. Chong unable to give a knowing, intelligent and voluntary assent to the guilty plea . . ." Pettis Affidavit at 6; *see also,* Supplemental Pettis Affidavit at 2.

In contrast, the Government presents a declaration from Dr. Carroll J. Diebold which states that while buproprion (Wellbutrin) "can cause occasional dizziness, nausea, constipation, dry mouth, and agitation . . . [f]eelings of 'apathy' have not been reported." Ex. 1 to Government's Supplemental Response filed March 9, 2001, Declaration of Carroll J. Diebold, M.D. at ¶ 9 (hereinafter "Diebold Dec."). Dr. Diebold concluded that "[t]o a reasonable degree of medical certainty, based upon my review of [Chong's medical records, medical literature and court records], Mr. Chong's ability to make an informed decision regarding his plea bargain agreement was not impaired by side effects of buproprion." Diebold Dec. at ¶ 15.

Contrary to Chong's now asserted complaints about the side effects of Wellbutrin, Chong's treating doctors state that Chong never expressed any concerns about feeling apathetic or calm to such a degree that he was unable to assert his will, nor any physical side effects such as headache. *See* Ex. 2 to Government's Supplemental Response filed March 8, 2001, Declaration of Dean J. Germer, M.D. at ¶ 13 (hereinafter "Germer Dec."); Ex. 4 to Government's Supplemental Response filed March 8, 2001, Declaration of Kenneth J. Zienkiewicz, M.D. (hereinafter "Zienkiewicz Dec."). Chong visited the medical unit twice a day for his diabetes from October 1, 1999 to July 25, 2000 and never once complained of headaches or apathy. *See* Germer Dec. at ¶ 14. Dr. Germer states that over the same period "Mr. Chong's demeanor, appearance, intelligence and abilities have been observed by me to be constant" and that he views Chong as "mentally sharp." *Id.* at ¶ 15. Dr. Zienkiewicz, Chong's primary treating and attending physician from July 1999 to the present, states that "[d]uring the entire time I have treated Mr. Chong, which would include numerous personal visits by him to me, I have never known him to be confused, irrational, apathetic or to have displayed any problems with his cognitive processes. I have never know Mr. Chong to complain about any of the above problems." Zienkiewicz Dec. at ¶ 5.

The Government also presents a Declaration from Dr. Matthews who examined Chong on December 29, 1999 and December 31, 1999, after Chong's dosage of Wellbutrin was increased. *See* Ex. 3 to Government's Supplemental Response filed March 9, 2001, Declaration of Daryl B. Matthews, M.D. (hereinafter "Matthews Dec."). During these examinations, Chong did not complain that his medication made him apathetic, but stated to the contrary that it gave him "clear focus". *Id.* at ¶¶ 10, 12. Chong stated to Dr. Matthews that the medication did not produce any side effects. *Id.* at ¶ 10.

The Declarations of Chong's three defense attorneys also show that Chong's decision to plead guilty was a deliberate and thoroughly reasoned and concerned decision. As an example, Ms. Morrissey, Chong's lead defense attorney states, among other things that:

During the time period from late November, 1999 through the date of his eventual guilty plea, I did not observe Mr. Chong become apathetic or observe changes in his demeanor that indicated to me a non-interest or lack of concern about his case; he appeared to be involved and interested in what was going on in his case. I would describe him as seeming resigned to the idea that a plea was in his best interest. Finally, I do not recall Mr. Chong's complaining during this time period about experiencing any side effects from his taking of the drug Wellbutrin.

Morrissey Dec. at ¶ 12. Ms. Morrissey also states that:

On Monday, January 10, 2000, the defense team received a plea agreement from the government. On Monday and Tuesday the defense team reviewed the agreement, and the statement of facts contained in paragraph 8 of the agreement, with Mr. Chong, in connection with our discussions with him concerning the decision to enter into the agreement or proceed to trial. Mr. Chong read the agreement and was aware of the facts the government would be required to prove him guilty of the first degree murder of William Noa. Mr. Chong agreed to plead guilty pursuant to the plea agreement, and understood that the government had evidence which, if believed, could prove the facts in the agreement. During this period Mr. Chong was rational and appropriately discussed the plea agreement and the plea process with the defense team. I did not notice any marked change in Mr. Chong's demeanor or conduct, apart from increased anxiety, which I believed to have been caused by necessity of making a decision about whether to plead guilty or go to trial. Mr. Chong was actively engaged with the defense team in discussions weighing the benefits and liabilities attached to his pleading guilty. I did not observe any apathy or lack of concern by Mr. Chong concerning this important decision. He was actively engaged in all discussions that I had with him concerning whether he should plead guilty or go to trial.

During the plea colloquy, when asked a direct question about whether he committed premeditated murder, Mr. Cong's demeanor was such that I recognized his concern at making this admission. However, I did not observe any conduct by Mr. Chong which indicated to me that he did not want to proceed with the guilty plea, nor did Mr. Chong communicate to me during the hearing that he needed assistance or that he did not wish to plead guilty pursuant to the agreement.

Morrissey Dec. at ¶¶ 9, 10.

Chong's letter to the Court dated July 7, 2000 states that "[n]earer towards my trial the dosage was increased. At that time I thought I was okay and ready to go to trial. Around this time I was indulged [sic] to plead guilty to life without parole and was convinced to do so." Chong Letter at 1. Contrary to what defense counsel now contends (that, while Wellbutrin enabled Chong to think more rationally, it caused him to lose concern for his future), Chong asserted in his letter that Wellbutrin "severely diminished my ability to rationally consider what I was doing." *Id.* Chong explains the effect Wellbutrin had on him by stating "[a]fter a time of not taking such high dosage, I came to the realization I never like plead guilty [sic] in the first place and presently don't want to but rather want to go [sic] trial prove my innocence [sic]." *Id.* Chong continues on to state that he was experiencing side effects of insomnia and painful headaches and "insisted I be taken off the drug or given something milder." *Id.* at 2.

Chong's recitation of the effect Wellbutrin had on him conflicts with his medical

reports and the reports of his attorneys. His medical records do not reflect any complaints of headache. *See* Germer at ¶ 10. Chong did not ask his doctors that he be taken off the medication until weeks after the letter was sent to the Court and was not, at that time, complaining of headaches or insomnia. *Id.* at ¶¶ 11, 12.

Chong suggests that it was the increased dosage of Wellbutrin that eventually affected him to such an extent that he was convinced to plead guilty. However, Chong's dosage was not increased until December 28, 1999. *See* Germer Dec. at ¶ 8 (Chong's dosage was increased from 200 mg/day to 300 mg/day on December 28, 1999 and reduced back to 200 mg/day on January 31, 2000). Moreover, the dosage of 300 mg/day is the standard dosage used in smoker cessation programs and according to the government's expert witness, is not considered an excessive dosage. *See* Diebold Dec. at ¶ 12. Prior to the increase in dosage, in late November or early December 1999, Chong first authorized his defense team to offer a guilty plea to first degree murder in exchange for the Government dropping the demand for the death penalty. *See* Morrissey Dec. at ¶ 6. The defense team met with the Government on December 16, 1999, again prior to the increase in Chong's dosage (although the government rejected this plea proposal). *See Id.* This demonstrates that Chong agreed with the idea of pleading guilty to first degree murder prior to the increase of his dosage of Wellbutrin.

In addition to authorizing his defense team to attempt to enter into a plea agreement, on December 21, 1999, Chong wrote a letter to the victim's girlfriend explaining his intent to enter a plea. *See* Raynette Letter at 1 ("I have decided to plead guilty to life in prison without possibility of parole that puts me away forever!"). This letter was authored prior to the increase in medication and shows that Chong's decision to plead guilty was made prior to the increase in medication.

At the time of the plea hearing, Chong had been taking the increased dosage of Wellbutrin for 2 weeks. *See* Germer Dec. at ¶ 8. Chong's contention that Wellbutrin prevented him from thinking clearly, or made him so wimpy that he ceased caring about his case or the future is contradicted by Chong's testimony at the change of plea hearing and at the hearing on the instant motion. First, the change of plea hearing, in response to the Court's further inquiry into whether Wellbutrin "impair[ed][his] ability to think clearly", Chong stated, "It doesn't impair me. It helps me, yeah." Tr. at 10. Secondly, Chong's testimony at the hearing on this Motion demonstrated that up until the change of plea hearing he was actively and intensely engaged with his attorneys regarding the decision to plead guilty. *See* Transcript of Hearing on Defendant's Motion to Withdraw Guilty Plea at 20–21 (hereinafter "Withdraw Plea Tr."). Chong testified that after the Government agreed to accept his guilty plea, a week prior to the scheduled trial date, he told his attorneys "un-uh, you know, let's go to trial. And then they bring people from when I was small and—you know, to talk to me, persisted to, you know, plead guilty, you know." Withdraw Plea Tr. at 21:1–4. Chong further testified that he "got in a yelling match with my lawyers" and had "one hell of an argument" regarding the decision to plead guilty while on the higher dose medication. *Id.* at 21:9, 36:11–12. Upon questioning by the prosecution Chong explained the process by which he agreed to plea:

Q: So your recollection is you do recall conceding, I think you've said?

A: Yeah.

Q: To your attorneys coming to the U.S. Attorney?

A: Yeah.

Q: And requesting that you get this bargain or this deal that you eventually pled guilty to; is that correct?

A: Yeah, after a line of people come talk to me and make you say: Okay, yeah. Yeah, I do.

*Id.* at 35:6–14. Chong also stated that his decision to plead guilty was based on the fact that "I feel bad for the people's family, man, you know." *Id.* at 21:16–19. Defense attorney Michael Weight confirmed that "[f]inally, [Chong] agreed to enter a guilty plea, in part to try to help the survivors of Mr. Noa have some closure, and in part to bring closure for his family to the uncertainty of his fate." Weight Dec. at ¶ 6. These actions contradict the idea that Chong lacked concern for his future and was not actively engaged in deciding whether to plead guilty or not.

Moreover, when Chong wrote the July 7, 2000 letter to the Court stating that he now realized that he never intended to plead guilty, he was still taking the exact level of medication as he was when he originally decided to plead guilty. Chong's claim that it was Wellbutrin that affected his thinking is thus inconsistent with his ability to motion the Court to withdraw his plea while still taking the medication. *See* Germer Dec. at ¶ 12. (Chong was not taken off Wellbutrin until July 25, more than two weeks after he wrote the Court.). In so far as whether the medication altered Chong's mental state, it is clear that it did not prevent him from going against the will of his attorneys or expressing a desire to not plead guilty. *See* Weight Dec. at ¶ 9 (In motioning the Court to withdraw his guilty plea, Chong was going against the direct and continuing advice of his defense counsel). Chong's decision to motion the court to withdraw his plea constitutes a classic change of heart and is not a result of a change in medication. A simple change of heart is not a fair and just reason to allow withdrawal of a guilty plea.

*See United States v. Rios–Ortiz,* 830 F.2d 1067, 1069–70 (9th Cir.1987).

Thus the record, and this Court's observations of Chong's conduct and demeanor at the Rule 11 hearing, support the Court's finding that Chong was competent to enter a knowing and intelligent guilty plea. *See Miranda–Gonzalez v. United States,* 181 F.3d 164, 166 (1st Cir.1999) (finding the court's inquiry regarding defendant's use of Xanax and Ativan at plea hearing sufficient to support court's subsequent denial of motion to withdraw guilty plea); *United States v. Buckley,* 847 F.2d 991, 998 (1st Cir.1988) (affirming denial of motion to withdraw plea on basis that medication made defendant "unable to rationally think about his guilty plea" where district court "relied mainly on its own recollection of the plea colloquy" in finding plea was knowing and intelligent); *United States v. Kearney,* 684 F.2d 709, 711 (10th Cir.1982) (affirming denial of motion to withdraw plea where court had specifically inquired about effects of defendant's medication at Rule 11 hearing); *United States v. McKoy,* 645 F.2d 1037 (D.C.Cir.1981) (holding where district court rejected defendant's claim that his anti-anxiety medication left him disarmed at time he entered into guilty plea: "Particularly in light of Judge Greene's personal observation of [defendant] at both hearings, we have no reason to question his unwillingness to accept the anti-anxiety medication as a fair and just basis for nullifying the guilty plea."). In short, there is absolutely no evidence that at the time Chong pled guilty he was unable to understand the proceeding; rather, the record amply supports the Court's determination that Chong fully understood the nature of the hearing and the gravity of his decision to plead guilty.

Considering all of these facts and observations, the Court stands by its original finding: that Chong's plea was a knowing, intelligent, and voluntary one, and con-

cludes that Chong has failed to meet his burden of asserting any "fair and just reason" that he should be allowed to withdraw his plea of guilty. Accordingly, the Court DENIES Defendant's motion.

## IV PREJUDICE TO THE GOVERNMENT

 As the Court has determined that Defendant has failed to establish valid grounds for withdrawal, an inquiry into government prejudice is unnecessary. *See Rios–Ortiz,* 830 F.2d at 1069. Such prejudice, however, may be considered by the Court. *See United States v. Read,* 778 F.2d 1437, 1440 (9th Cir.1985) ("The Government is not required to show prejudice when a defendant has shown no sufficient grounds for permitting withdrawal of a guilty plea, although such prejudice may be considered by the district court in exercising its discretion.") (quoting *United States v. Saft,* 558 F.2d 1073, 1083 (2d Cir.1977)).

Here, the Court finds that the Government has established that there is sufficient prejudice to the Government such that "it would be manifestly unjust to set [the plea] aside in the circumstances of this case." *United States v. Del Valle–Rojas,* 463 F.2d 228, 229 (9th Cir.1972) (where key witnesses were allowed to return to Mexico and thus become unavailable for a later trial, no abuse of discretion to refuse defendants motion to withdraw plea). The Government asserts that one of the key prosecution witnesses is homeless and currently cannot be found by the Government and therefore their case would be severely prejudiced. *See United States v. Simmons,* 497 F.2d 177, 179 (5th Cir.1974) (where released witnesses were transient and burden of finding them would be onerous, government had demonstrated sufficient prejudice). Moreover, the Government alleges that many of their percipient witnesses are methamphetamine users whose memories and recall would be ad-

versely affected by the further year and a half delay in trial date.

Beyond availability of witnesses the Government states that it would be difficult to reinstate their demand for the death penalty after previously accepting the plea to a life sentence. They state "entering into an agreement with Chong, the Government publicly acknowledged that while Chong is a future danger, litigative risks and the hope that he can be housed safely by the Bureau of Prisons led the government to agree to enter into a plea agreement with him. Having acknowledged our belief that he can be housed safely, it would be difficult to now seek the death penalty on the allegation that he can not." Response filed July 18, 2000 at 9. The Court agrees that any attempt by the government to seek the death penalty has been compromised by the earlier plea agreement. In combination with the potential unavailability or increased unreliability of its witnesses after this delay, the Court finds that any withdrawal of Chong's guilty plea would severely prejudice the Government.

Finally, the Court notes that allowing Chong to withdraw his guilty plea would inconvenience the Court and waste judicial resources. Chong pled guilty just before his scheduled trial date. The Court had set aside three months for the trial and had called 500 potential jurors who had responded to lengthy questionnaires. Restarting this process at this date would waste considerable judicial resources.

## CONCLUSION

For these reasons, the Court hereby DENIES Defendant's Motion to Withdraw Plea.

IT IS SO ORDERED.